**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

ELEVANCE HEALTH, INC.,
220 Virginia Avenue
Indianapolis, IN 46204;

ANTHEM HP, LLC,
1 Penn Plaza, 35th Floor
New York, NY 10119;

ANTHEM INSURANCE COMPANIES, INC.,
220 Virginia Avenue
Indianapolis, IN 46204;

BLUE CROSS OF CALIFORNIA PARTNERSHIP PLAN, INC.,
21215 Burbank Boulevard
Woodland Hills, CA 91367-7090;

COMMUNITY INSURANCE COMPANY,
4361 Irwin Simpson Road
Mason, OH 45040-9479;

FREEDOM HEALTH, INC.,
220 Virginia Avenue
Indianapolis, IN 46204;

GROUP RETIREE HEALTH SOLUTIONS, INC.,
1901 Market Street
Philadelphia, PA 19103-1480;

HEALTHKEEPERS, INC.,
2015 Staples Mill Road
Richmond, VA 23230-3108;

MMM HEALTHCARE, LLC,
350 Avenida Chardon, Torre Chardon, Suite 500 San Juan, PR 00918;

WELLPOINT INSURANCE COMPANY,
2505 N. Highway 360, Suite 300
Grand Prairie, TX 75050;

Civil Action No. 26-3943

WELLPOINT NEW JERSEY, INC.,
111 Wood Avenue South, Suite 220
Iselin, NJ 08830;

WELLPOINT TENNESSEE, INC.,
22 Century Boulevard, Suite 310
Nashville, TN 37214,

Plaintiffs,

v.

DEPARTMENT OF HEALTH AND HUMAN SERVICES
Hubert H. Humphrey Building
200 Independence Avenue, S.W.
Washington, D.C. 20201

CENTERS FOR MEDICARE & MEDICAID SERVICES
7500 Security Boulevard
Baltimore, MD 21244

Defendants.

## COMPLAINT

Plaintiffs Elevance Health, Inc., f/k/a Anthem Inc., along with its affiliated entities Anthem HP, LLC, Anthem Insurance Companies, Inc., Blue Cross of California Partnership Plan, Inc., Community Insurance Company, Freedom Health, Inc., Group Retiree Health Solutions, Inc., Healthkeepers, Inc., MMM Healthcare, LLC, WellPoint Insurance Company, WellPoint New Jersey, Inc., WellPoint Tennessee, Inc. (collectively, "Elevance Health" or "Plaintiffs"), by and through their undersigned counsel, hereby file this Complaint for relief against Defendants, the United States Department of Health and Human Services ("HHS") and the Centers for Medicare & Medicaid Services ("CMS") (collectively, "Defendants"). Elevance Health alleges as follows:

## INTRODUCTION

1. Elevance Health brings this action under the Administrative Procedure Act ("APA"), 5 U.S.C. § 701 *et seq.*, to rectify Defendants' continued use of unlawful methodology to calculate Medicare Advantage Star Ratings. Star Ratings are a financial cornerstone of the Medicare Advantage ("MA") program, determining quality bonus payments and rebate percentages for the private Medicare Advantage Organizations ("MAOs") that contract with CMS to provide Medicare coverage. Those dollars help fund the benefits beneficiaries rely on, including supplemental benefits like vision and dental, lower premiums, reduced cost-sharing, and coordinated care programs. When CMS gets the ratings wrong, the consequences reach beyond an MAO's balance sheet andaffect the resources available to serve Medicare beneficiaries.

2. A program with consequences this significant demands lawful, transparent, and predictable administration. CMS has instead made Star Ratings a moving target, repeatedly changing measures, revising technical guidance, and altering how the program is implemented. CMS distills numerous weighted measures into a single rating on a one-to-five-star scale, where even a half-star difference can determine whether an MAO receives substantial additional funding. Yet CMS has used annual "Technical Notes" and other subregulatory guidance to set standards that carry those financial consequences. Applicable to Star Ratings, Congress imposed two statutory safeguards that CMS cannot bypass and that are designed to ensure a consistent and transparent program.

3. First, CMS must use notice-and-comment rulemaking to establish or change a substantive legal standard governing Medicare payments. 42 U.S.C. § 1395hh(a)(2). Notice-and-comment rulemaking is designed to prevent precisely the kind of instability in Medicare payment standards that the Star Ratings program has created. CMS is required to put proposed substantive

payment rules before the public, give affected parties an opportunity to identify their consequences, and account for that input before adopting a final rule. Plans invest resources to improve quality and performance against CMS's measures, yet each year they confront changes to the rules by which that performance is judged and payment is determined. They are left aiming at goalposts that CMS keeps moving. Congress's rulemaking requirement does not freeze those goalposts in place; it requires CMS to use a transparent, public process before moving them. CMS cannot replace that safeguard with shifting technical guidance that leaves plans chasing a changing target and beneficiaries bearing the consequences.

4. Second, Congress mandated that Star Ratings be based on the "data collected under section 1395w-22(e)," 42 U.S.C. § 1395w-23(o)(4)(A), and not just any information CMS happens to possess in administering the Medicare program. That statutory cross-reference confines the basis for Star Ratings ratings to data collected through plans' quality improvement programs: the Healthcare Effectiveness Data and Information Set ("HEDIS"), which measures clinical quality; the Health Outcomes Survey ("HOS"), which measures health outcomes; and the Consumer Assessment of Healthcare Providers and Systems ("CAHPS"), which measures beneficiary experience and satisfaction. *See* 69 Fed. Reg. 46,866, 46,886 (Aug. 3, 2004). Congress further limited the types of data collected under those programs to those collected as of November 1, 2003, requiring CMS, before changing those categories of data, to submit a report to Congress prepared in consultation with MAOs and private accrediting bodies. 42 U.S.C. § 1395w-22(e)(3)(B). These limits make practical sense. A quality-based payment system should reward performance against established measures of care, outcomes, and beneficiary experience, not turn every administrative data source into a potential basis for reducing a plan's payment. Using established quality-measurement systems gives beneficiaries a common basis for comparing plans and gives plans a

predictable framework for directing investments toward better care, rather than diverting resources to meet an ever-changing set of reporting demands. Congress's framework also preserves accountability: CMS may pursue changes in the types of quality data it collects, but only through the consultation and congressional reporting process the statute prescribes. Allowing CMS to bypass that framework simply because it collects other information for other purposes would erase the safeguard. Enforcing the data-source limitation therefore protects not only plans from unauthorized payment reductions, but also beneficiaries' interest in meaningful quality comparisons and in having resources devoted to improving their care.

5. These are limits on agency power, not administrative preferences. CMS may neither substitute unauthorized data for the data categories for the data types Congress specified nor impose substantive payment standards through guidance instead of regulation. CMS violated both of these safeguards in calculating Elevance Health's 2027 Star Ratings. This action targets 11 unlawfully adopted measures because their inclusion harmed Elevance Health by depressing its 2027 Star Ratings for the 12 contracts identified in Exhibit A. CMS had not lawfully adopted any of those 11 measures through notice-and-comment rulemaking. Two of them, D08 and D10, also relied on Part D prescription drug event administrative claims data not collected under § 1395w-22(e). This challenge is thus directed at the unlawful measures that caused Elevance Health injury in the rating year at issue, not at every measure CMS uses in the Star Ratings program.

6. These legal defects are not novel. In *Clover Insurance Co. v. U.S. Dep't of Health & Human Servs.*, No. 2:25-cv-142, 2026 WL 1483515 (S.D. Ga. May 27, 2026), the court rejected components of CMS's 2026 Star Ratings methodology on the same statutory-authority and rulemaking grounds advanced here. It held that CMS may base its quality ratings only on measures using data collected under § 1395w-22(e), and it directed CMS to recalculate Clover's rating

without the defective measures. Elevance Health asks this Court to apply those same statutory limits to the 11 measures that harmed its 2027 Star Ratings. The governing legal constraints remain the same; the measures challenged here are identified by their unlawful adoption and their injurious effect on Elevance Health's ratings for this particular year.

7. CMS nevertheless continued to use measures suffering from those defects when it published Elevance Health's 2027 Star Ratings on October 8, 2026. At the same time, CMS voluntarily excluded the measures invalidated in *Clover* from Clover's 2027 ratings, even though that judgment addressed only Clover's 2026 ratings. CMS thus extended the benefit of that ruling to Clover's next rating year while continuing to apply legally defective measures to Elevance Health. Congress has not changed the governing statutory limits. A methodology that exceeds those limits does not become lawful when applied to a different MAO.

8. The harm from these 11 measures is concrete and substantial. Elevance Health projects that excluding them would increase the 2027 Star Ratings for the 12 contracts identified in Exhibit A and yield approximately $516 million in additional 2028 Quality Bonus Payments ("QBPs") and rebate retention. Their inclusion therefore does more than violate statutory requirements in the abstract: it depresses Elevance Health's ratings and reduces the funding available for the following payment year. That funding could support broader supplemental benefits, lower premiums and cost-sharing, and improved care coordination. CMS's unlawful methodology puts those resources out of reach.

9. The injuries to Elevance Health are not limited to payments. Star Ratings are intended to help Medicare beneficiaries make meaningful comparisons among plans. CMS publishes them through Medicare Plan Finder, where beneficiaries and their advisers evaluate coverage options. An artificially depressed rating does not merely place Elevance Health at a

competitive disadvantage; it undermines the very comparison the program is supposed to enable. A rating lowered by unlawful measures presents beneficiaries with a misleading signal of relative quality, rather than a lawful basis for distinguishing among competing plans. Beneficiaries cannot make informed coverage choices when the government's own comparison tool conveys a distorted assessment of the plans available to them.

10. That distortion directly impairs Elevance Health's ability to market its plans. Beneficiaries, brokers, and other advisers using Star Ratings to compare coverage may discount or pass over Elevance Health's plans because of ratings depressed by the 11 unlawful measures, not because of a valid assessment of the quality of care those plans provide. Those ratings make it harder for Elevance Health to communicate the value of its offerings, attract new members, and retain existing ones. The resulting harm is both competitive and beneficiary-facing: Elevance Health must market its plans under an artificially diminished quality rating, while beneficiaries are deprived of the reliable comparative information the Star Ratings program is intended to provide. The same unlawful inputs thus reduce the resources available to improve benefits and distort the information beneficiaries use to choose those benefits.

11. Elevance Health brings this action under APA to enforce the limits Congress imposed. It asks the Court to set aside the challenged 2027 Star Ratings for the contracts identified in Exhibit A, direct CMS to recalculate those ratings without the 11 unlawful measures, and require CMS to determine the corresponding 2028 QBPs and rebates using the corrected ratings.

## JURISDICTION, VENUE, AND EXHAUSTION

12. This Court has jurisdiction over this case pursuant to 28 U.S.C. § 1331 because this action arises under the Administrative Procedure Act ("APA"), 5 U.S.C. § 701 *et seq.*, and raises questions under the Medicare statute, 42 U.S.C. § 1395 *et seq*.

13. Venue is proper in this Court under 28 U.S.C. § 1391(e) because this is an action against United States agencies.

14. On October 8, 2026, CMS published the 2027 Star Ratings for Elevance Health's contracts H3240, H3655, H4003, H4004, H4471, H4694, H5427, H5828, H6078, H8432, H8849, and R5941, which constitute final agency action.

15. There is no administrative process available to Elevance Health to seek reconsideration of CMS's actions.

16. Elevance Health has standing because it holds =Medicare Advantage-Prescription Drug ("MA-PD") contracts and Defendants incorrectly calculated the 2027 Star Ratings for 12 of those contracts in excess of their statutory authority and without regard to procedures required by law.

17. Elevance Health's improperly calculated Star Ratings for the 12 contracts identified in Exhibit A will result in substantial economic injury to Elevance Health, with a projected 2028 financial differential of approximately $516 million.

## PARTIES

18. Elevance Health is an Indiana corporation with a principal place of business in Indianapolis, Indiana.

19. Elevance Health provides a full spectrum of healthcare plans and services to millions of members, many of whom are beneficiaries of the federal Medicare program. Elevance

Health, through its affiliates and subsidiaries, has entered into contracts with CMS to provide coverage to Medicare beneficiaries under Medicare Parts C and D. This action challenges the overall 2027 Star Ratings for the following 12 contracts, which are also identified in Exhibit A:

a. Contract H3240, which was entered into with CMS by WellPoint New Jersey, Inc., serves enrollees in New Jersey. Elevance Health is the designated parent organization under the MA program for this contract. This contract's 2027 Star Rating was 3 Stars. Had CMS calculated the 2027 Star Ratings without the 11 improper measures, this contract would have received an overall Star Rating of 3.5 Stars.

b. Contract H3655, which was entered into with CMS by Community Insurance Company, serves enrollees in Ohio. Elevance Health is the designated parent organization under the MA program for this contract. This contract's 2027 Star Rating was 3.5 Stars. Had CMS calculated the 2027 Star Ratings without the 11 improper measures, this contract would have received an overall Star Rating of 4 Stars.

c. Contract H4003, which was entered into with CMS by MMM Healthcare, LLC, serves enrollees in Puerto Rico. Elevance Health is the designated parent organization under the MA program for this contract. This contract's 2027 Star Rating was 4.5 Stars. Had CMS calculated the 2027 Star Ratings without the 11 improper measures, this contract would have received an overall Star Rating of 5 Stars.

d. Contract H4004, which was entered into with CMS by MMM Healthcare, LLC, serves enrollees in Puerto Rico. Elevance Health is the designated parent organization under the MA program for this contract. This contract's 2027 Star Rating was 4.5 Stars. Had CMS calculated the 2027 Star Ratings without the 11 improper measures, this contract would have received an overall Star Rating of 5 Stars.

e. Contract H4471, which was entered into with CMS by Blue Cross of California Partnership Plan, Inc., serves enrollees in California. Elevance Health is the designated parent organization under the MA program for this contract. This contract's 2027 Star Rating was 3 Stars. Had CMS calculated the 2027 Star Ratings without the 11 improper measures, this contract would have received an overall Star Rating of 3.5 Stars.

f. Contract H4694, which was entered into with CMS by Healthkeepers, Inc., serves enrollees in Virginia. Elevance Health is the designated parent organization under the MA program for this contract. This contract's 2027 Star Rating was 3 Stars. Had CMS calculated the 2027 Star Ratings without the 11 improper measures, this contract would have received an overall Star Rating of 3.5 Stars.

g. Contract H5427, which was entered into with CMS by Freedom Health, Inc., serves enrollees in Florida. Elevance Health is the designated parent organization under the MA program for this contract. This contract's 2027 Star Rating was 4 Stars. Had CMS calculated the 2027 Star Ratings without the 11 improper measures, this contract would have received an overall Star Rating of 4.5 Stars.

h. Contract H5828, which was entered into with CMS by WellPoint Tennessee, Inc., serves enrollees in Tennessee. Elevance Health is the designated parent organization under the MA program for this contract. This contract's 2027 Star Rating was 3 Stars. Had CMS calculated the 2027 Star Ratings without the 11 improper measures, this contract would have received an overall Star Rating of 3.5 Stars.

i. Contract H6078, which was entered into with CMS by Group Retiree Health Solutions, Inc., serves enrollees nationally, though primarily in Pennsylvania. Elevance Health is the designated parent organization under the MA program for this contract. This contract's 2027

Star Rating was 3.5 Stars. Had CMS calculated the 2027 Star Ratings without the 11 improper measures, this contract would have received an overall Star Rating of 4 Stars.

j. Contract H8432, which was entered into with CMS by Anthem HP, LLC, serves enrollees in New York. Elevance Health is the designated parent organization under the MA program for this contract. This contract's 2027 Star Rating was 3 Stars. Had CMS calculated the 2027 Star Ratings without the 11 improper measures, this contract would have received an overall Star Rating of 3.5 Stars.

k. Contract H8849, which was entered into with CMS by WellPoint Insurance Company, serves enrollees in Texas. Elevance Health is the designated parent organization under the MA program for this contract. This contract's 2027 Star Rating was 3 Stars. Had CMS calculated the 2027 Star Ratings without the 11 improper measures, this contract would have received an overall Star Rating of 3.5 Stars.

l. Contract R5941, which was entered into with CMS by Anthem Insurance Companies, Inc., serves enrollees in Ohio. Elevance Health is the designated parent organization under the MA program for this contract. This contract's 2027 Star Rating was 3.5 Stars. Had CMS calculated the 2027 Star Ratings without the 11 improper measures, this contract would have received an overall Star Rating of 4 Stars.

20. Defendant HHS is a department within the Executive Branch of the United States government that is responsible for the Medicare program. Its headquarters are located at 200 Independence Ave., S.W., Washington, D.C. 20201. HHS has delegated its authority to administer the Medicare program to CMS. *See* 66 Fed. Reg. 35437-03 (July 5, 2001).

21. Defendant CMS is a federal agency within HHS that is primarily responsible for administering the Medicare program. *See id.* Its headquarters are located at 7500 Security Blvd., Baltimore, MD 21244.

## FACTUAL ALLEGATIONS

### I. The Medicare Advantage Program

22. Medicare supplies federally established health insurance for individuals who are aged 65 or older, along with qualifying individuals with disabilities. *See* 42 U.S.C. § 1395 *et seq.*

23. The program divides coverage among four parts. Part A principally addresses institutional care, including hospital and skilled-nursing services, as well as hospice and qualifying home care. *See* 42 U.S.C. §§ 1395c–1395i-6 (Part A). Part B addresses outpatient care, physician visits, preventive services, home health care, and durable medical equipment. *See* 42 U.S.C. §§ 1395j–1395w-6 (Part B). Under the arrangement commonly known as "traditional" or "original" Medicare, the federal government acts as the insurer and directly reimburses participating providers for covered services provided to enrolled beneficiaries.

24. Part C offers a different delivery arrangement. Created through the Balanced Budget Act of 1997 and subsequently known as Medicare Advantage, it permits beneficiaries to obtain Medicare coverage through private organizations contracting with CMS. *See* 42 U.S.C. § 1395w-21 *et seq.* The Medicare Advantage program allows private health insurers to contract with CMS to provide Medicare-covered benefits to enrolled beneficiaries, thereby transferring the financial risk of providing Medicare benefits from the federal government to privately run MAOs in exchange for a per-member, per-month payment. *See* 42 U.S.C. § 1395w-23. The per-member, per-month payment amount paid must be at least as high as traditional Medicare spending per enrollee. Further, MAOs must provide members with at least the same level of benefits offered by traditional Medicare.

25. MAOs combine the coverage from Parts A and B, along with a prescription-drug benefit under Medicare Part D. Congress authorized Part D in the Medicare Prescription Drug, Improvement, and Modernization Act of 2003 ("MMA"), Pub. L. No. 108-173, 117 Stat. 2066, and coverage began in 2006. Contracts combining medical and drug coverage are commonly described as "MA-PD" plans.

26. The MMA also established an annual bidding process by which CMS sets geographic benchmarks against which an organization's projected costs are evaluated. *See* 42 U.S.C. § 1395w-23(a)(1)(B). The resulting comparison affects both the government's payment and the resources available for supplemental coverage.

27. Each year (by the first Monday of June), MAOs must submit their proposed estimated costs to provide basic Medicare benefits for the next coverage year, accounting for administrative overhead and profit. *See id.* § 1395w-24. Where the bid is below the relevant benchmark, CMS returns a portion of the savings as a rebate, which the MAO may use to fund further benefits or premium reductions. *See id.* § 1395w-23(a)(1)(E).

## II. Medicare Star Ratings and their financial impact on MAOs

### A. Background on Star Ratings

28. The Medicare "Star Ratings" program is CMS's primary tool aimed at measuring and publicizing the quality of care provided by MAOs—and the primary mechanism through which Congress created financial incentives for MAOs to compete on quality. Even before today's Star Ratings system, MAOs were required to maintain "an ongoing quality assurance program" for the healthcare services provided to their members. Pub. L. No. 105-33, § 4001, 111 Stat. 251, 291 (1997) (codified at 42 U.S.C. § 1395w-22(e)(1)).

29. Prior to 2003, Congress expressly granted CMS the authority to choose the "quality and outcomes measures" that the Secretary "determine[d] to be appropriate" as part of plans'

quality assurance programs. 42 U.S.C. § 1395w-22(e)(1), (e)(2)(A)(xii) (1997). That broad discretion caused uncertainty and confusion, as CMS proposed various quality measures and practice standards at will.

30. Congress narrowed that discretion in 2003, by writing CMS's quality measures into law through the MMA. *See* MMA, Pub. L. No. 108-173, § 109, 117 Stat. 2066 (2003). These amendments restricted CMS to requiring quality-measure data that were "the types of data that were collected by the Secretary as of November 1, 2003," permitting deviation from those data types only after submitting a report to Congress. 42 U.S.C. § 1395w-22(e)(3)(B). Congress simultaneously renamed quality assurance programs "quality improvement programs." *Id.* § 1395w-22(e)(1).

31. In 2004, CMS recognized this statutory constraint and indicated that, moving forward, it would rely only on existing collection systems as the basis for continued reporting of clinical quality, health outcomes, and beneficiary satisfaction: the Healthcare Effectiveness Data and Information Set ("HEDIS"), the Health Outcomes Survey ("HOS"), and the Consumer Assessment of Healthcare Providers and Systems ("CAHPS"). *See* 69 Fed. Reg. 46,866, 46,886 (Aug. 3, 2004).

32. CMS established its Star Ratings system in 2007. The Patient Protection and Affordable Care Act of 2010, Pub. L. No. 111-148, 124 Stat. 119, introduced the QBP program and adapted the Star Ratings system to implement it. Congress identified § 1395w-22(e) as the exclusive source of data for quality rating calculations, omitting the clause previously granting the Secretary discretion to consider other measures. *See* 42 U.S.C. § 1395w-23(o)(4)(A). Congress designed this framework to ensure that beneficiaries have access to meaningful, standardized quality information when selecting plans—and to create significant financial incentives for MAOs

to compete on quality.

33. On May 27, 2026, *Clover* held that "the plain text of 42 U.S.C. § 1395w-23(o)(4)(A), when read alongside surrounding statutory provisions in the Medicare Act, supports the conclusion that CMS may *only* base its quality rating calculations on measures using data collected under Section 1395w-22(e)." *Clover Ins. Co.*, 2026 WL 1483515, at *14.

**B. How Medicare Star Ratings are calculated**

34. CMS synthesizes a range of quality data about each contract into a Star Rating, which ranges from 1 to 5 stars, including half-Stars. Through a multi-step process, CMS scores the contract on each applicable "measure"—a discrete performance criterion measuring some aspect of quality—on a scale of 1 to 5; applies a predetermined weight to each measure score; and aggregates the weighted measure scores into a single overall Star Rating.

35. Because the overall Star Rating is a weighted average, a contract's score on any individual measure—particularly a high-weight measure—can tip the overall rating above or below a critical threshold. The 4.0-Star threshold is the most consequential: contracts rated at or above 4.0 Stars qualify for a QBP; contracts rated below do not.

36. Annual sub-regulatory CMS guidance known as the "Technical Notes" sets out the Star Rating methodology and operational details, including the measures used and the information necessary to score them. CMS updates these Technical Notes—and the measures they describe—outside of notice-and-comment rulemaking.

37. CMS's authority over that methodology is strictly bounded by 42 U.S.C. § 1395w-23(o)(4)(A) and § 1395hh(a)(2). Section 1395w-23(o)(4)(A) requires that the Star Rating system be "based on the data collected under section 1395w-22(e)"—meaning HEDIS, HOS, and CAHPS, the three measurement systems CMS itself identified as its permissible data sources.

38. CMS may not incorporate measures based on data from other sources. Nor may

CMS establish or materially change a measure specification that constitutes a "substantive legal standard governing the scope of benefits, the payment for services, or the eligibility of individuals, entities, or organizations to furnish or receive services or benefits" without promulgating a regulation through notice-and-comment rulemaking. 42 U.S.C. § 1395hh(a)(2).

### C. Rebates and Quality Bonus Payment eligibility

39. Under the MA program, MAOs submit bids to CMS, and when an MAO's bid falls below the applicable benchmark, the difference generates a "rebate" that CMS returns to the MAO for use in providing enhanced supplemental benefits, reducing cost-sharing, or lowering member premiums. The portion of the rebate that an MAO is permitted to retain—and deploy for these purposes—is directly tied to its Star Rating, creating a financial incentive for plans to invest in quality performance. Plans rated below 3.5 stars (including unrated or new plans) retain 50% of the rebate amount, while plans achieving a rating of at least 3.5 but below 4.5 stars retain 65%. Plans earning the highest tier of 4.5 stars or above retain the maximum 70% of the rebate, reflecting CMS's policy goal of rewarding higher-quality plans with greater financial flexibility. This tiered structure means that a plan's Star Rating has significant downstream implications not only for its QBPs but also for its ability to fund richer benefit designs and remain competitive in the marketplace.

40. Under 42 U.S.C. § 1395w-23(o), CMS pays a QBP to MAOs whose contracts achieve a Star Rating of 4.0 or above. The QBP takes the form of an increased benchmark—the maximum per-member amount CMS will pay—which in turn allows the MAO to offer enhanced supplemental benefits and return excess payments to enrollees as rebates.

41. There are substantial differences between the financial ramifications of a sub-4.0 Star Rating and those of a 4.0-or-above Star Rating. For a large MAO like Elevance Health, the

loss of QBP eligibility and the associated reduction in rebates can translate into the loss of hundreds of millions of dollars annually across its contracts.

**D. The Medicare Advantage cycle**

42. An MA contract's Star Rating for a given year determines its rebate retention and QBP, if any, for the subsequent contract year. Those anticipated rebates and QBP are incorporated into the bids MAOs submit to CMS the preceding June.

43. As relevant here, CMS released the 2027 Star Ratings for Elevance Health's (and all other MAOs') contracts on October 8, 2026. Those 2027 Star Ratings govern Elevance Health's rebate retentions and QBP for MA contract year 2028. Bids for the 2028 contracts are due to CMS in June 2027.

44. The following sets forth the typical schedule of key events in the Medicare Star Ratings cycle:

| **2027 Star Ratings – Key Periods and Events** | |
|---|---|
| Calendar Year 2025 | Measurement period for the performance data that serve as a baseline for Elevance Health's 2027 Star Ratings. |
| June 1, 2026 | Statutory bid deadline for 2027, factoring in anticipated 2027 rebate retentions and QBP based on 2026 Star Ratings |
| Aug. 5, 2026 – Aug. 12, 2026 | Plan Preview 1 for 2027 Star Ratings |
| Sept. 8, 2026 – Sept. 15, 2026 | Plan Preview 2 for 2027 Star Ratings |
| Oct. 8, 2026 | 2027 Star Ratings Published |
| Oct. 15, 2026 | Annual Election Period commences |
| Jan. 1, 2027 | Medicare Advantage Open Enrollment commences |
| June 7, 2027 | Statutory bid deadline for 2028, factoring in anticipated 2028 rebate retentions and QBP based on 2027 Star Ratings |
| 2028 | QBPs stemming from 2027 Star Ratings paid |

## III. Elevance Health's 2027 Star Ratings

### A. October 2026 Publication of 2027 Star Ratings

45. On October 8, 2026, CMS published the 2027 Star Ratings. With respect to the 12 contracts identified in Exhibit A, CMS assigned overall 2027 Star Ratings that were lower than they would have been had CMS not included the 11 unlawful measures. Exhibit A sets forth each contract's published rating and what its correct rating should be without the unlawful measures. Certain contracts would cross the 4-Star threshold governing QBP eligibility under 42 U.S.C. § 1395w-23(o), qualify for increased rebate percentages, or both.

46. CMS also published Elevance Health's measure-level Star Ratings on its website, making both the overall and measure-specific ratings accessible to Medicare beneficiaries, brokers, and the general public through the Plan Finder tool.

47. In publishing these Star Ratings, CMS relied on 11 measures that were unlawful for the same reasons that previously formed the basis for the court's decision in *Clover*.

48. The *Clover* court invalidated Clover's 2026 Star Ratings and directed CMS to recalculate those Star Ratings consistent with the court's conclusions. This remedy concerned Clover's rating for that year, rather than a prospective adjudication of every later measure.

49. CMS did not promptly appeal that decision or seek a stay. On the contrary, within two weeks of the order, CMS complied by recalculating Clover's 2026 Star Rating as the *Clover* court had directed. Remarkably, despite the fact that the court never addressed Clover's 2027 Star Ratings (and consequently the court's prior judgment did not apply to Clover's 2027 Star Ratings), CMS also voluntarily excluded the same measures for Clover's 2027 Star Ratings. This is notable because the measures that Elevance Health challenges in this case are unlawful for the same reasons as advanced in Clover, and by voluntarily removing measures for Clover's 2027 Star

Ratings, CMS has implicitly conceded that it implemented these measures in violation of the law—if not, there would be no reason to exclude them from Clover's 2027 Star Ratings.

50. Congress has not expanded CMS's legal authority over the Star Rating program in the intervening period. Indeed, nothing has changed in the past year such that the approach to Star Rating measures found unlawful in Clover might be considered lawful now, for purposes of calculating any MAO's 2027 Star Ratings.

51. Just as the measures found unlawful in Clover were defective because they were not promulgated through notice-and-comment rulemaking, the 11 measures Elevance Health challenges in this case suffer from the same defect.

| | |
|---|---|
| Measures Established or Materially Changed Without Notice-and-Comment Rulemaking | • **C02** (Colorectal Cancer Screening);<br>• **C03** (Annual Flu Vaccine);<br>• **C04** (Improving or Maintaining Physical Health);<br>• **C05** (Improving or Maintaining Mental Health);<br>• **C10** (Osteoporosis Management in Women who had a Fracture);<br>• **C14** (Controlling Blood Pressure);<br>• **C20** (Follow-up after ED Visit for High-Risk Chronic Conditions);<br>• **C21** (Getting Needed Care);<br>• **C23** (Customer Service);<br>• **D08** (Medication Adherence for Diabetes Medications); and<br>• **D10** (Medication Adherence for Cholesterol (Statins)). |

52. Furthermore, two of these measures are unlawful for the additional reason that they fail to comply with the requirement at 42 U.S.C. § 1395w-23(o)(4)(A) that data must be "collected under section 1395w-22(e)":

| | |
|---|---|
| Measures Based on Non-§ 1395w-22(e) Data Sources | • **D08** (Medication Adherence for Diabetes Medications);<br>• **D10** (Medication Adherence for Cholesterol (Statins)) |

**B. The impact of the 11 unlawful measures on Elevance Health's MA contracts**

53. Exhibit A to this Complaint presents a chart illustrating how the 2027 Star Ratings for each of the 12 challenged contracts would change if those ratings were recalculated after excluding the 11 measures challenged herein. As Exhibit A demonstrates, absent the 11 unlawful measures, Elevance Health projects that the challenged contracts would have received increased overall 2027 Star Ratings and, accordingly, would have been entitled to substantially larger rebates and QBPs.

**C. Reputational harm caused by the publication of unlawfully derived Star Ratings**

54. Moreover, CMS's publication of Star Ratings distorted by the inclusion of 11 unlawful measures has caused, and continues to cause, substantial reputational harm to Elevance Health. Star Ratings are publicly available on CMS's Medicare Plan Finder tool, where current and prospective Medicare beneficiaries consult them when making enrollment decisions and brokers and agents often emphasize Stars for selecting plans for enrollees. Simultaneously, because Star Ratings are relative, competing MAO ratings may be artificially elevated, further distorting how Elevance Health's plans are perceived and casting them in a less favorable light.

55. The reputational implications of a below-threshold Star Rating extend beyond any single enrollment cycle. Brokers and third-party marketing organizations that steer Medicare beneficiaries toward particular plans may deprioritize or refuse to market plans rated below 4 stars, diminishing Elevance Health's visibility and competitiveness in the marketplace. Employers and plan sponsors offering Medicare Advantage options to retirees may likewise treat Star Ratings as a proxy for plan quality, and a suppressed rating impairs Elevance Health's ability to compete for and maintain those relationships.

## CLAIMS FOR RELIEF

### COUNT I:
### AGENCY ACTION TAKEN WITHOUT OBSERVANCE OF PROCEDURE REQUIRED BY LAW
### (5 U.S.C. § 706(2)(D))

56. Elevance Health incorporates by reference the allegations set forth in paragraphs 1-55 above as if fully restated herein.

57. Under 5 U.S.C. § 706(2)(D), an agency is prohibited from acting without observance of procedure required by law.

58. Congress has required that CMS conduct notice-and-comment rulemaking and codify "by regulation" any "rule, requirement, or other statement of policy" that "establishes or changes a substantive legal standard governing the scope of benefits, the payment for services, or the eligibility of individuals, entities, or organizations to furnish or receive services or benefits under [Medicare]." *Azar v. Allina Health Servs.*, 587 U.S. 566, 570 (2019) (quoting 42 U.S.C. § 1395hh(a)(2)).

59. Furthermore, CMS's own regulations require it to adopt new quality measures through notice-and-comment rulemaking. *See* 42 C.F.R. § 422.164(c)(2) ("In advance of the measurement period, CMS will announce potential new measures and solicit feedback through the process described for changes in and adoption of payment and risk adjustment policies in section 1853(b) of the Act and then subsequently will propose and finalize new measures through rulemaking."). *See also id.* § 422.164(d) (requiring notice-and-comment rulemaking for substantive updates to existing measures); *id.* § 423.184(c), (d) (requiring same for Part D measures).

60. CMS failed to undertake the required notice-and-comment rulemaking and codify "by regulation" the following measures applied to Elevance Health in computing its 2027 Star

Ratings: C02, C03, C04, C05, C10, C14, C20, C21, C23, D08, and D10. Each of these measures establishes a substantive legal standard governing Elevance Health's QBP eligibility—and therefore governing "the payment for services" within the meaning of 42 U.S.C. § 1395hh(a)(2)—yet none was promulgated by regulation.

61. Because CMS derived the 2027 Star Rating for the contracts identified in Exhibit A using measures adopted without observance of procedure required by law (*i.e.*, notice and comment), the Court should set aside each of Elevance Health's unlawful overall 2027 Star Ratings for those contracts and direct CMS to recalculate those Star Ratings without regard to these measures.

**COUNT II:**
**AGENCY ACTION NOT IN ACCORDANCE WITH LAW, IN VIOLATION OF STATUTORY RIGHT, IN EXCESS OF STATUTORY AUTHORITY**
**(5 U.S.C. § 706(2)(A), (C))**

62. Elevance Health incorporates by reference the allegations set forth in paragraphs 1-55 above as if fully restated herein.

63. Congress limited the data on which CMS's Star Ratings may be based to data that an MAO collects, analyzes, or reports as part of its quality improvement program. 42 U.S.C. § 1395w-23(o)(4)(A) (requiring Star Ratings to be based on "data collected under section 1395w-22(e) of this title").

64. CMS calculated the 2027 Star Ratings for the 12 contracts identified in Exhibit A using measures that are based on data not collected under § 1395w-22(e).

65. Two of the measures challenged in this lawsuit (D08 and D10) were calculated using Part D prescription drug event ("PDE") administrative claims data generated outside the HEDIS, HOS, and CAHPS programs established under § 1395w-22(e).

66. Because CMS calculated the 2027 Star Ratings for the contracts identified in Exhibit A using data not collected under § 1395w-22(e), the Court should set aside the unlawful 2027 Star Ratings for those contracts and direct CMS to recalculate those Star Ratings without regard to these measures.

## PRAYER FOR RELIEF

WHEREFORE, Elevance Health respectfully requests that the Court enter judgment in its favor and grant the following relief:

a) Declare that CMS's inclusion of measures C02, C03, C04, C05, C10, C14, C20, C21, C23, D08, and D10 in calculating the 2027 Star Ratings for the contracts identified in Exhibit A was without observance of procedure required by law because CMS failed to adopt those measures through public notice and comment, as required by 42 U.S.C. § 1395hh(a)(2) and 42 C.F.R. § 422.164;

b) Declare that CMS's inclusion of measures D08 and D10 in calculating the 2027 Star Ratings for the contracts identified in Exhibit A is unlawful for the additional reason that CMS exceeded its statutory authority because those measures were calculated with data not collected under 42 U.S.C. § 1395w-22(e), as required by 42 U.S.C. § 1395w-23(o)(4)(A);

c) Set aside the overall 2027 Star Ratings of the contracts identified in Exhibit A and remand to CMS with instructions to recalculate each such contract's overall 2027 Star Rating by excluding the 11 unlawful measures identified in this Complaint, resulting in the correct overall Star Rating identified in Exhibit A;

d) Order CMS to determine all 2028 QBPs and rebates in accordance with the recalculated and correct Star Ratings as reflected in Exhibit A;

e) Order CMS to permit Elevance Health to revise any previously submitted MA bid(s) necessary to effectuate the judgment, consistent with this Court's order, the recalculated Star Ratings, and the revised QBPs and rebates; and

f) Award Elevance Health such other and further relief as the Court may deem just and proper, including costs and fees, as permitted by law.

[*Signature Page Follows*]

Dated: November 6, 2026

/s/*Daniel W. Wolff*

Daniel W. Wolff
DWolff@crowell.com
D.C. Bar No. 486733
**Crowell & Moring LLP**
600 Fifth Street, N.W.
Washington, DC 20001
Telephone: (202) 624-2621

Steven D. Hamilton (*pro hac vice*)
StevenHamilton@crowell.com
Illinois Bar No. 6289663
**Crowell & Moring LLP**
300 N. LaSalle Drive, Suite 2500
Chicago, IL 60654
Telephone: (312) 379-7615

*Counsel for Plaintiffs*

**Exhibit A**

| Contract | 2027 Overall Star Rating, as Published | Correct 2027 Star Ratings |
|---|---|---|
| H3240 | 3 | 3.5 |
| H3655 | 3.5 | 4 |
| H4003 | 4.5 | 5 |
| H4004 | 4.5 | 5 |
| H4471 | 3 | 3.5 |
| H5427 | 4 | 4.5 |
| H5828 | 3 | 3.5 |
| H6078 | 3.5 | 4 |
| H8432 | 3 | 3.5 |
| R5941 | 3.5 | 4 |
| H4694 | 3 | 3.5 |
| H8849 | 3 | 3.5 |